**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STEVEN M. STIEGEL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )    **2:12-cv-377** |
| **v.** | ) |
| | ) |
| **PETERS TOWNSHIP and OFFICER** | ) |
| **MATTHEW RUSSELL COLLINS,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is MOTION FOR SUMMARY JUDGMENT (ECF No. 32)
filed by Defendants Peters Township and Officer Matthew Russell Collins ("Collins") with brief
in support (ECF No. 33). Plaintiff Steven M. Stiegel ("Plaintiff" or "Stiegel") filed a response in
opposition (ECF No. 38); Defendants filed a reply (ECF No. 40); and Plaintiff filed a surreply
(ECF No. 42-1). The summary judgment record has been fully developed with Defendants'
concise statement of material facts (ECF No. 34), Plaintiff's response and counterstatement of
material facts (ECF No. 39), Defendants' response thereto (ECF No. 41), and the parties' various
exhibits (ECF Nos. 35, 39). Accordingly, the motion is ripe for disposition.

### I.      Background

#### A. Factual Background

The following background is taken from the Court's independent review of the motion
for summary judgment, the filings in support and opposition thereto, and the record as a whole.

##### 1.  Collins' Interaction with Stiegel & Majcher

This action arises from events which occurred on the night of January 30, 2012, when
Stiegel and his friend, Nolan Majcher, were predator hunting on private property in North

Strabane Township. Both Stiegel and Majcher are licensed hunters who may legally possess firearms.

That evening, Sergeant Collins was the shift supervisor for the Peters Township Police Department. Collins has been employed as a Peters Township police officer since 1995. As the shift supervisor that night, Collins was dressed in full police uniform, drove a marked police car and oversaw the three other officers on duty.

Around 11:00 pm, Collins was taking his meal break at his residence located in North Strabane Township when he received a 9-1-1 radio transmission regarding a domestic dispute in Peters Township. Collins directed two patrol officers to that scene and prepared himself to curtail his break early to assist his fellow officers. Reportedly, supervisors respond with patrol officers to domestic dispute dispatches if the call includes a report of physical altercations.

As Collins was traveling on South Spring Valley Road toward Peters Township, he noticed a lone vehicle parked ahead close to a pull-off on North Spring Valley Road in an "unusual" and "suspicious" position: several hundred yards away from any houses around 11:00 pm on a rural stretch of an unlit dead-end road near an area where Collins had encountered criminal activity in the past.[1] Collins further observed a small LED-like light emanating from somewhere near the vehicle, which he again thought was "very suspicious" and "strange." Collins likewise appreciated that vehicles do not commonly park in that area at night—which sits in North Strabane Township but touches the periphery of Peters Township—based on his experience from using North Spring Valley Road daily to patrol Peters Lake Park. Nevertheless,

_____

1. Among those instances, Collins found a known drug dealer and addict with whom he was personally familiar near the wooded area using drugs and holding her father's ashes/urn at her side. *See* Dep. of Collins, ECF No. 35-1 at 69-73. John Kozer (spelled Coser elsewhere in the record) owns the land and has also complained to Collins about illegal dumping, trespassing, and hunting on his property. *See id.* at 18-19. Kozer has advised Collins that few people are permitted to be on the property and asked Collins to "keep an eye out" for criminal activity, as he does not live on the property. *See id.* The edge of Kozer's land is within fifty yards of Collins' residence, and Collins has observed trash littered across Kozers' property in the past. *See id.* at 21, 71-72.

Collins decided to obtain the registration plate for the vehicle, determine whether he could offer assistance, and resolve any problems that required immediate attention even though the "suspicious area" is outside his jurisdiction.[2]

During his approach, Collins noticed an individual seated on the hillside in front of the parked car with a shotgun draped across his lap and the barrel pointed in his general direction. The individual, later identified as Nolan Majcher, was carrying a 12-gauge shotgun and was wearing a camouflage outfit. From his perspective, Collins feared that the then-unidentified individual was planning to commit suicide in the wooded area or preparing to perpetrate a home invasion. Collins pulled up parallel to the parked car, but he did not activate his emergency lights, announce himself as a police officer, or call for back-up. Nonetheless, Majcher suspected that the vehicle and its occupant may be associated with law enforcement due to the distinct spotlight on the vehicle. *See* Dep. of Nolan Majcher, ECF No. 35-3 at 21 ("Q. Okay. Now at some point – at what point did you realize the vehicle was a police car? A. Just, I don't know if it was because I'm just used to police cars with my dad [an Upper St. Clair police officer], I don't know, but, really, when the spotlight on the side hit me, I'm like, 'That's a cop.'").

Collins exited his vehicle to assess the situation and commanded Majcher to put down the weapon without identifying himself as a police officer. Majcher instead stood up and took a few steps toward the police vehicle from his location about ten yards away with his shotgun held in a

---

2. Stiegel denies most of these facts, contending that "[i]t would be improper for him to initiate an investigation into something he considered to be 'suspicious' in North Strabane Township, where [Collins] was not a police officer." Pl.'s Resp. to CSMF, ECF No. 39 at 2, ¶ 6. Moreover, Stiegel disputes Collins' description of the scene by offering argument and legal conclusions. *See id.* ("A legally parked car is objectively not suspicious."). Of course, general denials, legal conclusions, and statements unsupported by the record do not create a material dispute of facts. *See Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) ("[Plaintiff] must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or such vague statements."); *De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP*, 792 F. Supp. 2d 812, 820 n.4 (E.D. Pa. 2011) ("Conclusory statements or legal conclusions, even if characterized as disputes of fact, contained within a party's submissions are 'entirely insufficient' to create a genuine dispute and withstand a motion for summary judgment.") (quoting *Ashton v. Whitman*, 94 F. App'x. 896, 902 (3d Cir. 2004)); *see also* LCvR 56(E).

vertical position.  Collins, again without identifying himself as a police officer, unholstered his service pistol, pointed it at Majcher, and aggressively repeated his command for Majcher to stop and drop his weapon.  Majcher immediately complied and placed his shotgun on the ground.[3]

Now unarmed, Majcher walked towards Collins with his hands raised shoulder-height, during which time he indicated that he was "Nolan Majcher," asked "is this really necessary," and explained that he and a friend were legally fox hunting.  Collins recognized Majcher as the son of an Upper St. Clair police officer and inquired into the name of the friend; Majcher indicated that the other hunter in the woods was Steven Stiegel, a surname Collins recognized as having permission to hunt on this property.[4]  Collins then asked Majcher "what the fuck are you doing" and directed him over to the hood of the police car after demanding that he remain still.  When Majcher reached the vehicle, he placed his hands on the hood as instructed and confirmed Collins' identity as a police officer without the obstruction of the vehicle's beams and spotlight that previously impaired his vision.  Throughout this encounter, Collins remained in a defensive position behind the front driver-side door and kept his handgun aimed center mass on Majcher.

---

3.  Stiegel also denies this version of events.  *See* Pl.'s Counterstatement of Facts, ECF No. 39 at 4, ¶¶ 15-16 ("As stated by Nolan Majcher, he saw the car, he unloaded his weapon, he pointed it straight up and down, he is told to drop the weapon, he does so, he holds his hands in the air, palms out, he walks down to the car, and he sees that the gun is pointed directly at him, even after he disarmed. . . . Officer Collins pulled his weapon to intimidate.").  But Majcher's own statements demonstrate his initial non-compliance and hesitation.  *See* Dep. of Majcher, ECF No. 35-3 at 21 ("I have a battery on my side, with a cord attached to a light, which is mounted on a bracket on my gun.  So it was kind of hard to undo my light, put the gun down.  I take a couple more steps, figuring – just going off past experience, it's usually not – generally, given the circumstances, the situations diffuse relatively.  I take a few more steps, and I'm told again to stop.  At this point I'm like this (indicating) [hand at shoulder height and palms showing].") ; Statement of Majcher, ECF No. 39-1 ("I begin walking to the road, gun held vertical in my right hand and my left hand palm out at about shoulder height.  Looking back, this is the point in which I fell I may have made a mistake.  Perhaps I should have maintained my position until further instructed by the officer.").  Stiegel later contends that there is perhaps only one disputed fact.  *See* Pl.'s Counterstatement of Facts, ECF No. 39 at 23 ("118. Another telling element of this case is that the facts are mostly undisputed.  119. The only fact where there is a possible dispute here is whether Officer Collins pointed his weapon at Steven Stiegel.").

4.  Collins learned that "one of the Stiegels" was permitted to hunt on Kozer's property during a conversation in 2004 or 2005 with his friend, Bob Benner, who also has permission to hunt on the property.  *See* Dep. of Collins, ECF No. 35-1 at 20-21, 76.

Once Majcher indicated that Stiegel was still in the woods, Collins scanned the horizon of the field with his personal flashlight and observed a second individual holding a shotgun. With his firearm aimed in Stiegel's direction, Collins called out for him to drop his weapon or else he would be shot. Stiegel immediately complied and began to exit the woods, assuming that a firearm was pointed at him. *See* Dep. of Stiegel, ECF No. 35-4 at 48-49 ("Q. And you started to walk out of the woods. You had light in your eyes for a period of time, then the light was no longer in your eyes. But you don't have a recollection of the officer pointing his weapon at you at any point? A. Like I said, I assumed there was a gun drawn on me, otherwise I wouldn't have complied with that dropping of my weapon."); *see also id.* at 64 ("Q. Okay. My only question is, again, there was not any occasion during this incident when factually you saw Sergeant Collins stick his gun in your face is that correct? A. He never stuck a gun in my face."); *c.f.* Compl. at 16, ¶ 126 ("Steven Stiegel has suffered personal injury emanating from stress and anxiety, which should be understandable to anyone who imagines themselves having a gun stuck in their face, with belligerent language, under tense circumstances, and under the color of authority."). As Stiegel approached, Collins observed that both hunters were complying with his orders and were no longer armed. Based on these observations and his need to gather identification, Collins holstered his firearm before Stiegel exited the woods.

Once they were all at the police car, Collins questioned Stiegel as to what the two men were doing, whether they had permission to be on the property and why they did not notify the North Strabane Police Department of their presence. Collins also asked Stiegel to present identification and he complied. Stiegel did not, however, observe Collins' firearm at this point. As part of his questioning, Collins asked Stiegel if he was related to Gary Stiegel. Stiegel responded that Gary was his brother. At this juncture, Collins indicated that he had a more

serious call to which he needed to attend and indicated that he would follow-up with the Game Commission at a later time. The entire encounter lasted five to ten minutes, and Collins left without issuing any citation. Throughout his interaction with Stiegel and Majcher, Collins never came into physical contact with either hunter.

While in route to the domestic dispute call, Collins reached out to numerous contacts regarding his encounter with the hunters. First, Collins contacted the dispatcher to request that the Game Commission respond; however, the operator informed him that no officer was working that night. Second, Collins called the supervisor for North Strabane in which he indicated that he encountered two men hunting, that he obtained their basic information, and that he would file a report. Third, Collins called two fellow police officers who were off-duty that evening for purposes of his report to inquire whether they knew, as experienced hunters, whether it was permissible for anyone to fox hunt on a roadway. Fourth, Collins called the Upper St. Clair Police Station in an attempt to brief Majcher's father on the incident, but he was not working at that time. Collins prepared a written report of the incident the following day.

By all accounts, Stiegel and Majcher were allowed to hunt on the subject property. *See* Dep. of Stiegel, ECF No. 35-4 at 13-15. Rob Kozer, the son of John Kozer, apparently granted Stiegel and his brother permission to be on the land for many years. According to Stiegel, "a handful or two" of other people have permission to hunt on the property.

### 2. Stiegel's Complaint to Peters Township & Follow-Up

The following day, Stiegel called Peters Township Police Department and spoke with Captain Michael D. Yanchak. Stiegel conveyed his version of events to Yanchak and voiced concerns about his interaction with Collins. Afterward, Stiegel was not convinced that his phone conversation would guarantee any changes and decided to submit a formal written complaint.

Stiegel submitted a Departmental Complaint Form to the Peters Township Police Department on February 1, 2012. To summarize, Stiegel made the following complaints about Collins: that his tone was arrogant and rude, that he never activated the emergency lights on the police vehicle, that no back-up officers were called; that he never identified himself or his authority; that he was out of his jurisdiction; and that he interfered with two law abiding citizens who were legally hunting.

The formal complaint was investigated by Yanchak who later drafted a report of his findings for Chief Harry J. Fruecht. In his report, Yanchak indicated that he spoke with Dean Majcher (Nolan's father), interviewed Nolan Majcher, talked at length with Stiegel, reviewed Collins' written response to the complaint, and contacted Wildlife Conservation Officer Dan Sitier for information about Pennsylvania's Game and Wildlife Code and the enforcement of related regulations. Yanchak ultimately concluded that "there could possibly have been a policy violation" of § 1301.07 CONDUCT TOWARDS THE PUBLIC, but he deemed it "Not Sustained."[5] ECF No. 39-1 at 31. Yanchak also refuted each of Stiegel's complaints in his report, identified Collins' failure to announce himself as a police officer "a training issue," recommended that the department explore the possibility of training in scenarios typically handled by a Wildlife Conservation Officer, and expressed concern regarding actions taken by third-parties throughout his investigation, including the request for investigation-related material

---

5. Policy Manual § 1301.07 provides as follows:

    a.   Employees in the performance of their duties shall be polite, civil, orderly, and maintain decorum and command of temper and refrain from the use of harsh, coarse, profane or uncivil language; nor shall they use ethnic designations, insults or other ethnic derogatory terms at any time when addressing any person.

    b.   Employees shall give their name when requested by any person.

ECF No. 39-1 at 31.

before the completion of his report by the Township Manager at the urging of Stiegel's brother who is a member of Peters Township Council.

Yanchak sent the report to Fruecht on February 28, 2012. After his review, Fruecht concluded that there had been no violations in connection with the Stiegel hunting incident. Fruecht advised Stiegel on February 29, 2012 that his investigation had determined that Collins' actions on the night in question were not contrary to department policy, but disclosed that training issues would be addressed department-wide. Unsatisfied with the outcome of the investigation, Stiegel sent an e-mail to Peters Township Manager Michael Silvestri in which he describe the course of events and expressed his lack of confidence in the internal oversight policies of the police department. Stiegel recommended that the Township establish a Community Review Board to oversee the conduct of police officers in Peters Township.

The topic of a "Police Complaint Review Process" was included on the Township Council agenda for discussion at the March 12, 2012 meeting, which Stiegel, Fruecht, and a few other police officers attended.[6] The minutes of that meeting indicate that a council member publicly identified Stiegel and that a public debate ensued. At the conclusion of that discussion, Council directed Silvestri to examine the Police Complaint Review Process to include additional oversight by the Township Manager. *See* ECF No. 39-1 at 57. The Township ultimately did not adopt Stiegel's recommendation for a Citizens Review Board, but it did modify the review process to include the right to appeal a decision of Fruecht to Silvestri.

---

6. That night, the "McLaughlin incident" was also discussed. The "McLaughlin incident" involved Sergeant Maloni, an off-duty Peters Township police officer, who had been hunting with his son on the Queen of Heaven cemetery property owned by the Diocese of Pittsburgh. Maloni apparently believed the cemetery property to be the private property of an acquaintance from whom he received permission and an explanation of the boundaries. After McLaughlin heard shots, he called the police and Officer Burnetti of the Peters Township Police Department arrived. McLaughlin later complained that Burnetti used aggressive and inappropriate language with him in dismissing his complaint. *See* ECF Nol. 39-1 at 37-39. After an investigation, Fruecht concluded that there had been no violations.

### 3. Collins' Training & the Peters Township Police Department's Policies

Collins has received training throughout his career, which extends beyond his time with Peters Township. Beginning in 1990, Collins attended basic training and advanced individual training to become a military policeman, a rank which he achieved in 1992. After he finished his service in late 1994, Collins attended the municipal police academy from January 1995 until he graduated four months later. Since joining the Peters Township Police Department in 1995 as a an officer and continuing through his promotion to sergeant in February 2010, Collins has received training in drug interdiction, crime scene photography, interview and interrogation, patrol tactics and yearly mandatory training; completed several tactical training courses to qualify as a member of the South Hills SWAT team in 2009; and attended ALERT active shooter training. As a South Hills SWAT team member, Collins also attends training twice per month, receives training in "shoot/don't shoot" and "draw/don't draw" scenarios, and regularly reviews a use of force policy. Within Peters Township, Collins acts as a training officer on handling critical situations.

The Peters Township Police Department maintains a manual which includes specific written policies on the Use of Force: Non-Deadly & Deadly (ECF No. 35-6); the Discharge of Weapons (ECF No. 35-6); and General Firearms Regulations (ECF No. 35-7). From Stiegel's perspective, the firearms policies have not always been followed. For example, Stiegel highlights an incident in which Fruecht accidentally discharged a firearm in the police station when he was assisting an elderly couple dispose of a very old revolver; Fruecht later disciplined himself for discharging a firearm in violation of department policy. Additionally, Stiegel points to the deposition testimony of Officer Jay Griffith, the firearms officer and Glock armorer for

Peters Township, who stated that Collins modified his firearm without authorization on one occasion to achieve a lighter trigger pull but was never disciplined.

The police department also maintains a "Municipal Police Cooperative Agreement" with neighboring municipalities of Burgettstown, Cecil, North Franklin, North Strabane, Smith, and Washington. *See* ECF No. 39-1 at 43-46. The focus of that agreement is for cooperation among the police forces, as authorized by state law, in combatting driving under the influence offenses. *See* 42 PA. CONS. STAT. ANN. § 8953.

### B. Procedural History

Stiegel commenced this action by filing a three-count Complaint in which he alleges violations of his First, Fourth, and Fourteenth Amendment rights secured by the United States Constitution. More specifically, the Complaint raises three claims: (i) that Collins violated Plaintiff's Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983; (ii) that the policy, custom, or practice of Peters Township makes it liable for the constitutional violations of Collins; and (iii) that both Defendants violated Stiegel's First, Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. §§ 1985, 1988. Stiegel later withdrew his § 1985 claim. *See* ECF Nos. 14 at 19; 15 at 1 n.1.

Defendants moved the Court to dismiss the Complaint and to strike various paragraphs from the pleading. By Memorandum Opinion and Order, the Court denied the motion to dismiss and granted in part/denied in part the request to strike.

After the close of discovery, Defendants filed a motion for summary judgment which Stiegel opposes in its entirety. For the reasons that follow, the Court will grant the motion and enter judgment in favor of Defendants.

## II.    Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A dispute about a material fact is "genuine" only if "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. *See Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary

judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," FED. R. CIV. P. 56(c) (1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage. *Anderson*, 477 U.S. at 255. Those functions are for the jury, not the court. *Id.* The court is thus limited to deciding whether there are any disputed issues and, if so, whether they are both genuine and material. *Id.*

### III.    Discussion

Stiegel alleges a violation of his Fourth Amendment rights pursuant to 42 U.S.C. § 1983 and asserts *Monell* liability against Peters Township. The Court will discuss each count seriatim.[7]

---

7. Although Stiegel pleaded his § 1983 claim against Collins as a single count, the parties have some dispute regarding its scope and the framework by which it should be addressed. *See* Pl.'s Br. in Opp., ECF No. 38 at 5 ("The Defendant's brief separates the unreasonable use of force claim from the unreasonable search and seizure claim. The case law makes no similar distinction."). Stiegel does, however, rely upon several distinct concepts in arguing that his Fourth Amendment rights were violated. *See, e.g.*, *id.* at 10 ("As in *Brown*, the stop in this case was neither reasonable nor reasonably effected."); *id.* at 10 n.2 (suggesting that a jury should decide if Collins' actions constituted a de facto arrest); *id.* at 11 ("A jury will find that Officer Collins' use of force was manifestly unreasonable."). Thus, the Court is constrained to analyze the entirety of the events (with some overlap) that unfolded on January 30, 2012.

## A. Count One

Section 1983 of title 42 of the United States Code does not create substantive rights, but rather provides a remedy for the violation of rights created by federal law. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). A prima facie case under § 1983 requires a plaintiff to demonstrate: (1) that the alleged wrongful conduct was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). There is no dispute that Collins was a law enforcement officer who acted under color of state law; however, the parties disagree as to whether he violated Stiegel's Fourth Amendment rights secured against abridgment by the States through the Fourteenth Amendment.

There are generally two components to Stiegel's Fourth Amendment claim, namely (1) whether Collins seized Plaintiff without reasonable suspicion; and (2) whether the display of the firearm by Collins was excessive. Stiegel also makes reference to a de facto arrest, suggesting that Collins exceeded the scope of any lawful conduct.[8] The Court will address each in turn.

### 1. The Initial Stop

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

---

8. Defendants submit that "it has never been disputed that Sergeant Collins engaged in an investigatory *Terry* stop." Stiegel contends "[t]hat is not accurate" based on a quotation he borrows from *Brown v. City of Milwaukee* and cites to the Court. *See* Pl.'s Br. in Opp., ECF No. 38 at 10 n.2 ("As stated in *Brown*, which was also quoted to the Court at the motion to dismiss stage, '[s]ubtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a de facto arrest.'") (quoting 288 F. Supp. 2d 962, 973 (E.D. Wis. 2003)). Moreover, Stiegel posits that "[i]t will be up to the jury to assess reasonableness under the circumstances and the jury should not be unduly pigeonholed based on a concession that was never actually made." *Id.* Stiegel is mistaken if he means to suggest that the Court cannot decide this issue as a matter of law. *See United States v. Persinger*, 284 F. App'x 885, 889 (3d Cir. 2008) ("Whether a *Terry* stop transforms into an arrest is not a fact, but a question of law requiring an analysis of the reasonableness of the intrusion.") (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995)).

13

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. CONST. amend. IV. The Supreme Court of the United States has recognized three distinct types of police-citizen interactions subject to the Fourth Amendment's protections: (i) arrests, which must be supported by probable cause, *see Brown v. Illinois*, 422 U.S. 590 (1975), (ii) brief investigatory stops, which must be supported by reasonable suspicion, *see Terry v. Ohio*, 392 U.S. 1 (1968), and (iii) consensual encounters between police and citizens, which require no objective justification, *see Florida v. Bostick*, 501 U.S. 429, 434 (1991).

Relevant here, in *Terry*, the Supreme Court held that law enforcement may, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S., at 30). Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Of course, a law enforcement officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27).

Reasonable suspicion is instead measured by "'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Each factor contributing to an officer's suspicion may be "by itself readily susceptible to an innocent explanation" yet still have a cumulative effect of establishing reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (noting that *Terry* precludes a "divide-and-conquer analysis"); *see also Sokolow*, 490 U.S. 9 ("Any one of these factors is not

by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion.").

Here, the Court finds that reasonable suspicion existed for Collins to conduct an investigatory stop. Collins personally observed a lone vehicle and a small light emanating nearby in what he deemed an "unusual" and "suspicious" position: several hundred yards away from any houses around 11:00 pm on an unlit dead-end road near an area where he had encountered criminal activity in the past and where vehicles do not commonly park at night. Collins further observed a lone individual sitting with a shotgun draped across his lap as he approached this area, leading him to suspect that the then-stranger was planning to commit suicide or preparing to perpetrate a home invasion. And Collins observed that individual rise and walk toward a marked police vehicle and a uniformed officer with his weapon in hand. Taken together, the Court finds that there are specific, articulable facts based on Collins' observations and experience from which rational inferences were drawn to support a finding of reasonable suspicion. *C.f. Florida v. J.L.*, 529 U.S. 266, 272 (2000) (holding that an anonymous tip that a person is carrying a firearm is not, without more, sufficient and declining to adopt an automatic "firearms exception" to the established Fourth Amendment reliability analysis required by *Terry*).

Thus, the Court concludes that Collins did not violate Stiegel's Fourth Amendment rights at the inception of his brief investigatory detention. The fact that Collins was outside of his territorial jurisdiction when he conducted the *Terry* stop does not change this conclusion. *See United States v. Rodriguez*, 1:12-CR-0005, 2013 WL 2338485, at *2 n.1 (M.D. Pa. May 29, 2013) ("Courts have consistently held that simply because an arrest or investigatory stop occurred outside the police officer's jurisdiction does not render the seizure per se

unreasonable.") (collecting cases); *see also Vangerve v. Pennsylvania*, CIV.A. 10-2581, 2011 WL 2326970, at *5 (E.D. Pa. June 14, 2011) ("Thus, even assuming that Power acted outside of his municipal jurisdiction had merit, such a violation would not support a § 1983 claim.").

### 2. Use of Force

The use of excessive force by law enforcement officials in making an arrest may give rise to a claim under 42 U.S.C. § 1983 for a violation of the Fourth Amendment.

To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Curley v. Klem*, 499 F.3d 199, 203 n.4 (3d Cir. 2007). The parties do not dispute that a "seizure" occurred; therefore, the only question is whether the use of force during was unreasonable.

 "The test of reasonableness under the Fourth Amendment is an objective one." *Los Angeles County, California v. Rettele*, 550 U.S. 609 (2007). Proper application of the reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempt to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Other relevant factors include "the duration of the action, whether the action takes place in the context of affecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

The Court must make this assessment "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham* 490 U.S. at 396. As the Supreme Court has cautioned, "[n]ot every push or shove, even if it may later seem unnecessary in the

peace of a judge's chambers violates the Fourth Amendment." *Id.* (citation omitted). Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-397.

Here, the Court concludes that Collins did not use excessive force in un-holstering his service weapon and training it first on Majcher (who was never a party to this litigation) and later toward Stiegel. This minimal amount of force was objectively reasonable under the circumstances. Collins observed an individual seated on a hillside around 11:00 p.m. in the middle of winter with a high-powered weapon draped across his lap and pointed in the general direction of the vehicles—circumstances which intensified when that same individual began to walk toward the marked police car, still armed, and hesitated to follow a verbal command. As Collins questioned Majcher, he learned that a second individual was out in the woods also armed with a shotgun. Collins thus was outnumbered by two armed men in the dead of night and in a location known for criminal activity. Keeping his service weapon drawn and pointed in the direction of an individual whose identity Collins had yet to confirm, he issued a verbal command for Stiegel to disarm and walk toward the police vehicle. As soon as Collins observed that Majcher and Stiegel were complying with his verbal commands, he re-holstered his weapon, obtained some basic information, and left the scene. By Stiegel's own admission, there was never any physical contact whatsoever. The entire interaction occurred within the span of five to ten minutes. Based on the totality of the circumstances, the Court finds that Collins acted in a reasonable manner.

The Court cannot accept Stiegel's spin on these events, shaped with the benefit of hindsight. Among his assembly of facts, Stiegel focuses on the single use of an expletive by Collins to Majcher (again, never a party to this lawsuit) while he was still in the woods; claims that Collins should have deduced that Majcher and Stiegel were hunters upon his arrival, and submits that Collins should have simply believed Majcher when he identified himself as a hunter and immediately disengaged once he recognized the surname Stiegel. Although the Court certainly recognizes that Collins may have better handled the situation (*e.g.*, by announcing himself as a police officer) and conducted himself more professionally (*e.g.*, by refraining from his use of an expletive), he was forced to make a judgment about the amount of force to deploy in an uncertain and tense situation. This decision to un-holster and train his firearm on Majcher and Stiegel must be judged by Collins' perspective at the time, not second-guessed with the benefit of 20/20 hindsight. Bearing that standard in mind, the Court cannot conclude that the actions taken by Collins at the scene that night were unreasonable.

### 3. De Facto Arrest/Scope of the Stop

"Under the *Terry* cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." *Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d Cir. 1995) (citations omitted). But there is no bright-line test to determine when a *Terry* stop crosses the line and ripens into a de facto arrest. *See Brown v. City of Philadelphia*, CIV. A. 07-0192, 2008 WL 269495, at *7 (E.D. Pa. Jan. 29, 2008) ("The line between a proper Terry stop and an improper de facto arrest is elusive and not easily drawn."). Even the use of guns or handcuffs, which are so closely identified with police arrests, do not necessarily convert a detention into an arrest. *See Baker v. Monroe Twp.*, 50 F.3d 1186,

1193 (3d Cir.2005). ("There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest."); *see also United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) ("We have recognized that 'the vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se.'") (quoting *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir.1995)).

Here, the brief investigatory stop did not ripen into a de facto arrest. Collins quickly secured the scene, questioned Majcher and Stiegel, sought their identification, and left the scene within five to ten minutes of his arrival, hardly a delay unnecessary to the ends of a legitimate investigation. Pointing his firearm at the hunters while attempting to garner compliance and assure his personal safety likewise did not transform this reasonable stop into an unlawful arrest. Indeed, police officers may use force "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). *See also Terry*, 392 U.S. at 23 ("[T]here is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.").

The totality of these facts, coupled with Fourth Amendment jurisprudence, leads the Court to conclude that Collins acted reasonably throughout the entire investigatory stop and never exceeded the scope of his lawful authority. To be sure, Collins was neither dilatory nor overly intrusive in his effort to confirm or dispel his suspicions. Accordingly, the Court will grant the motion for summary judgment as to the § 1983 claim(s) pled at Count One.

### B. Count Two: *Monell* Claim

Axiomatically, Stiegel cannot establish any *Monell* liability against Defendant Peters Township absent an underlying constitutional violation. *See Mills v. City of Harrisburg*, 350 F.

App'x 770, 773 n.2 (3d Cir. 2009) ("Absent an underlying constitutional violation by an agent of the municipality, however, the municipality itself may not be held liable under § 1983.") (citing *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003)); *Verbanik v. Harlow*, CIV.A. 09-448, 2012 WL 4378198, *9 (W.D. Pa. Sept. 25, 2012), *aff'd*, 12-3887, 2013 WL 310237 (3d Cir. Jan. 28, 2013) ("Of importance, however, is that the absence of an underlying constitutional violation precludes any supervisory liability on a 'knowledge or acquiescence' or 'failure to train' theory.") (citations omitted).  Thus, because the Court holds that there was no underlying constitutional violation, it will likewise grant the motion for summary judgment as to Count Two of the Complaint.

## IV.    Conclusion

For the reasons hereinabove stated, the Court will grant the motion for summary judgment in its entirety.  An appropriate Order follows.


McVerry, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN M. STIEGEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **2:12-cv-377** |
| v. | ) |
| | ) |
| PETERS TOWNSHIP and OFFICER | ) |
| MATTHEW RUSSELL COLLINS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER OF COURT

AND NOW, this 24th day of February, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION FOR SUMMARY JUDGMENT (ECF No. 32) filed by Defendants Peters Township and Officer Matthew Russell Collins is **GRANTED** in its entirety. Judgment will be entered in favor of Peters Township and Officer Matthew Russell Collins and against Plaintiff Steven M. Stiegel. The clerk shall thereafter docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:     **Thomas J. Farnan, Esquire**
        Email: tfarnan@rlmlawfirm.com

        **Estelle K. McGrath, Esquire**
        Email: ekmcgrath@mdwcg.com
        **Paul D. Krepps, Esquire**
        Email: pdkrepps@mdwcg.com
        **Teresa O. Sirianni, Esquire**
        Email: tosirianni@mdwcg.com